UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ARIEL MACKLIN,                          :
    Plaintiff,                      :
                                    :
    v.                              :    C.A. No. 19-561WES
                                    :
BISCAYNE HOLDING CORP. d/b/a Wild Zebra, :
and CHRISTOPHER VIANELLO,               :
    Defendants.                     :

**MEMORANDUM AND ORDER**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

    Plaintiff Ariel Macklin, an exotic dancer, sued Defendants Biscayne Holding Corp. d/b/a

Wild Zebra and Christopher Vianello[1] to recover wages she alleges are owed to her and other

similarly situated exotic dancers who performed at the Wild Zebra under the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*  Her claim echoes those that this Court has

sustained in several other cases, which hold that exotic entertainers are economically dependent

on the venue where they dance and are similarly situated employees under FLSA.  See, e.g.,

Walsh v. Gilbert Enters., Inc., C.A. No. 15-472 S, 2016 WL 1384819, at *1 (D.R.I. Apr. 7,

2016), and Walsh v. Gilbert Enters., Inc., C.A. No. 15-472-WES, 2019 WL 1206885, at *1

(D.R.I. Mar. 14, 2019), certificate of appealability denied, C.A. No. 5-472 WES, 2019 WL

---

[1] In this memorandum and order, Defendants Biscayne Holding Corp. d/b/a Wild Zebra and Christopher Vianello are collectively referred to as "Defendants," while the venue at which Macklin and the Opt-in plaintiffs claim that they performed is called "the Wild Zebra."  As clarified by the declaration of Defendant Christopher Vianello, the Wild Zebra is actually operated by Biscayne Entertainment Corp., not by the entity named in the complaint, Biscayne Holding Corp.  Vianello Decl. I ¶¶ 3-7 (ECF No. 11-1).  Because neither Macklin nor the Opt-in plaintiffs have argued that the motion to compel arbitration should be denied because neither of the Defendants signed most of the arbitration agreements, this confusion over the entity named in the pleading will not be discussed further.  Cf. Grand Wireless Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 10-11 (1st Cir. 2014) (arbitration agreement may cover claims against other parties even if those parties did not sign the agreement); Restoration Pres. Masonry, Inc. v. Grove Europe Ltd., 325 F.3d 54, 62 n.2 (1st Cir. 2003) ("A non-signatory may be bound by or acquire rights under an arbitration agreement under ordinary state-law principles of agency or contract.").

2448670 (D.R.I. June 12, 2019); <u>Levi v. Gulliver's Tavern, Inc.</u>, C.A. No. 15-216 WES, 2018 WL 10149710, at *6 (D.R.I. Apr. 23, 2018); <u>Pizzarelli v. Cadillac Lounge, L.L.C.</u>, C.A. No. 15-254 WES, 2018 WL 2971114, at *7 (D.R.I. Apr. 13, 2018).

Complicating the FLSA claim in this case is the Wild Zebra's seemingly consistently applied practice, adopted in June 2015, of requiring that all dancers sign an agreement containing both an arbitration clause, as well as a waiver of the right to bring or participate in a class or collective action. Based on this practice, on July 13, 2016, Macklin signed a License Agreement as a prerequisite to performing at the Wild Zebra that contains a provision requiring binding arbitration (Paragraph 14). ECF No. 11-1 at 10. In reliance on this License Agreement, Defendants responded to Macklin's complaint by moving to enforce Paragraph 14, seeking to dismiss or stay the case in favor of arbitration. ECF No. 11. After the motion to compel arbitration was filed, nineteen women filed notices of their intent to opt-in to Macklin's case (collectively, the "Opt-ins"); their opt-in notices were followed by their motion for conditional certification pursuant to 29 U.S.C. § 216(b). ECF No. 24. Barred by the collective action waiver in her License Agreement, Macklin did not join the certification motion. <u>Id.</u> Claiming that all but three of the Opt-ins had signed either the same License Agreement as Macklin or a different one that also calls for binding arbitration and waives class/collective action, Defendants countered with a motion to dismiss or compel arbitration of sixteen of the Opt-in claims and challenging the standing of the remaining three. ECF No. 27. Post-hearing, Plaintiff and the Opt-ins moved for equitable tolling of the statute of limitations applicable to those who are similarly situated. ECF No. 34.

The motion for equitable tolling (ECF No. 34) was referred to me for determination, while the other motions (ECF Nos. 11, 24 and 27) were referred for report and recommendation.

2

See Text Orders, June 8, 2020; June 9, 2020; August 14, 2020.  Pursuant to the directive in

Patton v. Johnson, 915 F.3d 827, 832 (1st Cir. 2019) (error for magistrate judge to address

motion to compel arbitration as dispositive), as well as the cases holding that § 216(b)

conditional certification is not a dipositive determination, e.g., Meyer v. Panera Bread Co., 344

F. Supp. 3d 193, 197 n.1 (D.D.C. 2018), Porenda v. Boise Cascade, L.L.C., 532 F. Supp. 2d 234,

238 (D. Mass. 2008), I am addressing those aspects of these motions (to compel arbitration and

for conditional certification) pursuant to 28 U.S.C. § 636(b)(1)(A).  However, as noted *supra*, in

addition to moving to stay in favor of arbitration in ECF No. 27, Defendants also asked the Court

to dismiss or strike all of the Opt-in claims because they were filed before the case was

conditionally certified and to dismiss the three Opt-ins who did not sign arbitration agreements

because they lack standing.  ECF No. 27.  The dispositive aspects of ECF No. 27 are addressed

separately by a report and recommendation, ECF No. 39, which recommends that the motion to

dismiss be denied.  28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I.      BACKGROUND

### A.      Macklin

On October 18, 2019, Macklin filed her complaint, which alleges that she "was

previously employed as an exotic dancer at . . . [the] Wild Zebra."  ECF No. 1 ¶ 38.  According

to the pleading, her job was to perform dances variously described as "adult entertainment" or

"exotic dancing," on stage, as a table dancer, and to entertain the customers of the Wild Zebra in

its "VIP" area; she alleges that she was compensated exclusively through tips paid by customers.

ECF No. 1 ¶¶ 40-41.  The Wild Zebra charged her a "house fee" per shift and required her to

share her tips with other employees.  Id. ¶ 42.  The Wild Zebra controlled the circumstances of

her work by retaining the sole right to hire and fire dancers; by instructing dancers when, where,

and how they were to perform; by exercising control over music selection; by requiring dancers to show up for work at a fixed time to perform during shifts pursuant to a schedule issued in advance; by suspending and fining dancers who violated the rules; and by setting the prices charged for the dancers' performances.  Id. ¶¶ 44-46.

Supported by a sworn declaration, on December 11, 2019, Defendants moved to compel Macklin into binding arbitration, averring that her performances at the Wild Zebra were in accordance with a License Agreement that she executed on July 16, 2016, when she first began to perform there.  Vianello Decl. I ¶¶ 10-14.[2]  In addition to providing that Macklin was self-employed and would perform for tips, the License Agreement includes Paragraph 14, which prominently displays the following text:

> 14.    **Arbitration**.  <u>Any and all claims, disputes, controversies, or disagreements of any kind whatsoever between the parties</u> hereto including but not limited to those arising out of or related to the relationship between the parties and/or this Agreement including its construction or interpretation, which may have occurred prior to or after entering into this Agreement <u>shall be resolved exclusively by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules and Procedures</u>.  Any award under such arbitration shall be final and binding on the parties and the expense of such arbitration shall be borne equally by the parties.  Licensee agrees that the requirement to arbitrate shall also apply to any claim which Licensee may assert against Licensor's employees, officers, directors, shareholders, and/or agents.  The award of the arbitrator(s) may be confirmed and enforced in any court of competent jurisdiction.  Such arbitration shall be conducted in the Providence, Rhode Island vicinity and be governed by the Federal Arbitration Act.  BY SIGNING THIS AGREEMENT, THE PARTIES ARE WAIVING THEIR RIGHTS TO A JURY TRIAL BECAUSE ANY AND ALL CLAIMS BETWEEN THE PARTIES AND/OR THEIR EMPLOYEES, OFFICERS, DIRECTORS, SHAREHOLDERS AND/OR AGENTS WILL BE RESOLVED EXCLUSIVELY THROUGH ARBITRATION.

Vianello Decl. I Ex. D ¶ 14 (emphasis added).  The License Agreement also includes Paragraph 15, entitled "**Class and Collective Action Waiver**," which bars Macklin from suing as a

---

[2] Defendant Christopher Vianello submitted three declarations, two of which are pertinent to these motions: ECF No. 11-1, referred to as Vianello Decl. I; and ECF No. 27-3, referred to as Vianello Decl. II.

plaintiff or class representative in a class or collective proceeding or from opting into a class or collective case.  Id.

Macklin's response to the motion to compel arbitration has been a moving target.  First, while she did not deny that she had signed the License Agreement before she began performing at the Wild Zebra, she argued that Paragraph 14 is unenforceable because it is procedurally unconscionable based on her status as an exotic dancer and the circumstances under which she signed it[3] and it is substantively unconscionable because of the requirement that the cost of the arbitration must be shared and because it must be conducted under the Commercial Arbitration Rules of the American Arbitration Association ("AAA").  However, beyond the conclusory claim that she was not able to negotiate, Macklin has provided no facts to support these arguments.  Then, during the hearing on the motions, she shifted ground, acknowledging that the AAA Commercial Rules specifically provide that the AAA must apply the "Employment Fee Schedule to any dispute between an individual employee or an independent contractor (working or performing as an individual and not incorporated) and a business or organization."  ECF No. 12-2 at 11 n.*.  Because the AAA Employment Fee Schedule caps the filing fee and has other provisions protecting the worker bringing the claim from undue expense, Macklin's counsel advised the Court that she would not resist the motion to compel arbitration as long as it is clear that these AAA rules would apply to her claim.  See generally D'Antuono v. Serv. Rd. Corp., 789 F. Supp. 2d 308, 343 (D. Conn. 2011) (because exotic dancer case involves employment-related claim, AAA Employment Rules apply, undermining argument that arbitration costs are prohibitively high).  Then, in a post-argument filing, her attorney advised the Court that Macklin

---

[3] Anticipating this argument, the Vianello Declaration I describes the Wild Zebra's practice for procuring signatures from dancers as appropriate and unpressured.  Vianello Decl. I ¶¶ 10-13.  Macklin has not taken issue with this description.

initiated an arbitration proceeding in August 2020 and asked that her claim be stayed while the arbitration proceeds.  ECF No. 36 at 2 n.1.

### B.   Opt-Ins Who Signed Arbitration Agreements

After the motion to compel Macklin into arbitration was filed, during January 2020, Macklin's attorney posted on social media[4] what Defendants characterize as a "notice process by engaging in a . . . campaign to provide counsel's own notice to potential Opt-ins," urging dancers who believe they were improperly paid by the Wild Zebra to contact him.  ECF No. 27 at 3 (referencing ECF No. 27-2).  Later in January and into April 2020, the nineteen Opt-ins filed notices stating the intent of each to pursue an individual claim against the Wild Zebra for failure to pay wages under FLSA unless and until the Court certifies a collective or class and then to designate whoever is class representative as her agent; some, but not all, of the notices also recite that the dancer worked for the Wild Zebra[5] "at some point" during the period from October 18, 2016, to the present.[6]  ECF Nos. 14-20, 22-23.  On May 11, 2020, the Opt-ins moved for

---

[4] The postings that focused on the Wild Zebra were published at various dates in January 2020.  ECF No. 27-2 at 3-6.  One posting is an undated, generic (does not mention the Wild Zebra) advertisement for Plaintiff's counsel identifying counsel as an attorney qualified to bring FLSA cases on behalf of exotic dancers.  Id. at 7.  The content of the Wild Zebra-targeted postings is similar:

> **thedancersrights**  The attorneys for Dancers Rights sued Wild Zebra of Providence with a federal lawsuit.  Clubs must pay minimum wage, overtime and can't charge dancers house fees or force tip sharing improperly.  If you know about Wild Zebra's labor practices or think you may have a case, [direct message] us.

ECF No. 27-2 at 6.

[5] A few of the notices name "Showgirls" instead of Wild Zebra, possibly a typographical error caused by counsel's failure to delete the name of a club in a different case.  E.g., ECF Nos. 15-1 at 1; 17-2 at 1; 17-3 at 1.

[6] The limitations period for FLSA actions is set forth in 29 U.S.C. § 255, which provides, in part, that the action "may be commenced within two years after the cause of action accrued, . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  Id. § 255(a); see Pike v. New Generation Donuts, LLC, Civil Action No. 12-12226-FDS, 2016 WL 707361, at *4 (D. Mass. Feb. 20, 2016).  The complaint alleges a willful violation, triggering the three-year limitations period.  ECF No. 1 ¶ 57.  For Macklin, whose claim was filed on October 18, 2019, she can sue for the period beginning on October 18, 2016, if she can sustain her allegation that the violation was willful.  This is not the relevant period for the Opt-ins; their lookback period is measured from the date of the filing of the notice of their intent to opt in.  29 U.S.C. § 256(b).

certification of the collective pursuant to FLSA § 216(b).  ECF No. 24.  In support, they proffered four declarations, averring that they performed for forty or more hours per week based on shift schedules set by the Wild Zebra, were paid only a portion of dance fees and tips, had to pay various house fees and fines for rules transgressions (such as being late for a shift), danced as directed by the Wild Zebra for prices charged to customers set by the Wild Zebra, with costumes as required and approved by the Wild Zebra, and shared tips as dictated by the Wild Zebra.  ECF Nos. 24-4 to 24-7.  Based on these averments, the Opt-ins argue that they are similarly situated with respect to their job duties, as well as the significant and uniform level of control over their work and the identical protocols for compensation for their services set by the Wild Zebra during the relevant period.  Therefore, they contend, the Court should order that the collective is contingently certified and that the Opt-ins' proposed notice be sent.

In addition to opposing the motion for conditional certification, Defendants responded with a new motion, seeking to dismiss the Opt-ins as prematurely filed (before the Court addressed the Macklin motion to compel arbitration and before conditional certification of the collective), and (alternatively) seeking to compel arbitration and enforce arbitration agreements signed by all but three of the Opt-ins.  ECF No. 27.  In support, they filed the Vianello Declaration II, which avers that the Wild Zebra began to require all dancers to sign an arbitration agreement with a class/collective action waiver in June 2015.  Vianello Decl. II ¶¶ 15, 23. Defendants argue that, based on this consistently applied practice (which the affiant avers was confirmed by his investigation), all dancers who performed in the three-year period preceding the filing of this case are required to bring FLSA claims individually in arbitration and are barred from proceeding in a collective action.[7]  As a result of this practice, the motion asserts that

---

[7] As of this writing there is no evidence to contradict Defendants' averment that, based on the Wild Zebra's consistent enforcement of this policy, there are no Wild Zebra dancers with standing to assert FLSA claims before

fifteen of the nineteen Opt-ins signed a License Agreement[8] identical to the one signed by

Macklin, while two signed a newer version entitled "Entertainment Agreement."[9]  ECF No. 27 at

5-7.  Like the License Agreement, the Entertainment Agreement purports to establish that the

dancer performs as an independent contractor, not an employee; in Paragraph 21, it contains the

parties' "mutual agreement to arbitrate" any controversy that may arise through "binding

arbitration in accordance with the Federal Arbitration Act[,]" and delegating to the arbitrator the

"exclusive authority to resolve any and all disputes over the formation, validity, interpretation,

scope and/or enforceability of any part of this agreement."  E.g., ECF No. 27-3 at 76, 77, 78

(emphasis in original) (capitals omitted).  Like the License Agreement, it waives the dancer's

right to participate in a class or collective action.  Id. at 78.  Unlike the License Agreement, the

Entertainment Agreement does not specify that the arbitration must be governed by the AAA

Commercial Rules and it permits the arbitrator to allocate fees and costs "equally as the law

permits."  Id. at 79.

    In response to the motion to compel arbitration, sixteen Opt-ins echoed Macklin in

generically arguing that the circumstances of the formation of both the License Agreement and

---

this Court within the applicable statute of limitations period.  In response, Plaintiff's counsel argues one dancer
(Cassandra McRae) may have slipped through (that is, performed within the applicable three-year period without
signing an arbitration agreement), but has presented no evidence to support this argument and otherwise has not
argued that Defendants' averment is inaccurate.  This contrasts with other exotic dancer FLSA cases in this
jurisdiction, where some members of the collective might have signed arbitration agreements, but not all and not the
class representative.  See Walsh, 2019 WL 1206885, at *2 ("some putative class members (but not Plaintiff) may be
subject to arbitration agreements"); Pizzarelli, 2018 WL 2971114, at *8 (named plaintiff did not sign arbitration
agreement, while others but not all dancers in class did).

[8] The fifteen Opt-ins who signed the License Agreement are: Shannon Gavel, Shakiyla Zito, Sierra (Skye) Acosta,
Kimberly Davila, Jasmine Vasquez, Yalett Alejandro, Lashaunda Ingram, Kaitlin Throckmorton, Brittney
Guilmette, Elisabeth James, Alicia Barnella, Nicole Ely, Deja Jones, Daizha Pittman, and Natasha Sajous.  Vianello
Decl. II ¶¶ 15-16; ECF No. 27-3 at 13-72.

[9] The two Opt-ins who signed the Entertainment Agreement are: DeAnna Gallo and Natasha Sajous.  Vianello Decl.
II ¶¶ 17-18; ECF No. 27-3 at 73-98.  Ms. Sajous signed both Agreements; she signed the License Agreement in July
2019 and the Entertainment Agreement in January 2020.  Vianello Decl. II ¶¶ 16, 18; ECF No. 27-3 at 69-72, 86-98.

the Entertainment Agreement were such as to render the Agreements unenforceable as unconscionable but provided no evidence to support the contention.  ECF No. 30 at 8-11. Similarly, they challenged as unconscionable the License Agreement's requirement that the cost of arbitration shall be borne equally by the parties but provided no facts regarding the size of their claims and their ability to pay and ultimately conceded that the AAA Commercial Rules are not unconscionable because they redirect the arbitrator to the AAA Employment Fee Schedule. And like Macklin, twelve of the sixteen Opt-ins who signed arbitration agreements have now initiated arbitration and ask that their claims be stayed while the arbitrations proceed.  ECF No. 36 at 2 n.1.

   C.   **Opt-Ins Who Did Not Sign Arbitration Agreements**

   For the remaining three Opt-ins (Sancharae Kelly, Cassandra McRae and Alyssa Trueheart), there is no arbitration agreement.  Vianello Decl. II ¶¶ 20-22; ECF No. 27-3 at 99-103.  Defendants assert that this is consistent with Wild Zebra's practice of requiring that all dancers sign the License Agreement (or later, the Entertainment Agreement) before being allowed to perform, in that these Opts-ins did not perform at the Wild Zebra either at all (Kelly and Trueheart)[10] or at any time during the three-year period preceding the filing of her opt-in notice (McRae).[11]  Vianello Decl. II ¶¶ 20, 22.  Defendants challenge the standing of these Opt-

---

[10] Supported by Vianello Declaration II, Defendants contend that Kelly and Trueheart have never performed at the Wild Zebra; therefore, neither signed an arbitration agreement.  Vianello Decl. II ¶ 20; ECF No. 27 at 6.  As of this writing, neither of these Opt-ins have presented any evidence to counter this sworn averment.  Kelly's opt-in notice is not under oath and alleges only that she "worked for the Wild Zebra at some time between October 18, 2016, and the present." ECF No. 15-3 at 1.  However, her opt-in notice was not filed until January 23, 2020, therefore, the period referenced in the notice exceeds her potential lookback period by approximately three months and is facially inadequate to establish standing.  The Trueheart notice is more deficient – other than stating that she agreed to pursue a claim against her "employer," the Wild Zebra, it says nothing about when or whether she ever performed at the Wild Zebra.  ECF No. 23-2.

[11] McRae's opt-in notice, which is not under oath, was filed on January 27, 2020, and recites that she performed at "Showgirls" at some time between October 18, 2016, and the present.  ECF No. 17-3.  Defendants agree that McRae performed at the Wild Zebra in 2015 and 2016.  Vianello Decl. II ¶¶ 21-22.  However, any FLSA claim for those periods is barred by the statute of limitations, which cuts off claims prior to three years before the filing of her opt-in

ins to assert claims pursuant to Fed. R. Civ. P. 12(b)(1) and ask the Court to dismiss them.  ECF No. 27 at 32-34.  In the separate report and recommendation, ECF No. 39, I have urged the Court to deny this motion as premature unless or until either one or more of these Opt-ins seeks to become the lead plaintiff and class representative, or the case reaches the phase when the Court must rule on a motion to decertify a conditionally certified collective.

## II.     LAW AND ANALYSIS

### A.     <u>Arbitration</u>

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*., the Supreme Court has repeatedly emphasized that courts must "'rigorously enforce' arbitration agreements according to their terms."  <u>E.g.</u>, <u>Am. Express Co. v. Italian Colors Rest.</u>, 570 U.S. 228, 233 (2013) (quoting <u>Dean Witter Reynolds Inc. v. Byrd</u>, 470 U.S. 213, 221 (1985)).  While the First Circuit has not yet identified the proper standard of review for a motion to compel arbitration, <u>Baker v. Montrone</u>, No. 18-cv-0913-PB, 2020 WL 128531, at *1 (D.N.H. Jan. 10, 2020), when the motion is made in connection with a motion to dismiss or stay, district courts may rely on the relevant facts from the operative pleading, as well as documents submitted to the Court in support of the motion to compel arbitration.  <u>Cullinane v. Uber Tech., Inc.</u>, 893 F.3d 53, 55 (1st Cir. 2018).  Where (as in this case) the court must consult evidence to resolve the issues, it is appropriate to employ the summary judgment standard.  <u>Baker</u>, 2020 WL 128531, at *1; <u>Proulx v. Brookdale Living Cmtys. Inc.</u>, 88 F. Supp. 3d 27, 29 (D.R.I. 2015).

---

notice.  <u>See</u> n.6. *supra*.  Macklin's counsel represents that the reference to "Showgirls" is an error that will be (but has not yet been) corrected.  ECF No. 36 at 3-4.  If this proffer were supported by the filing of a corrected notice, it would still be insufficient to establish that McRae has standing based on having performed at the Wild Zebra after January 27, 2017.  In that regard, Macklin's counsel represents that McRae will testify that she worked at the Wild Zebra until November 2017.  However, as of this writing, she has not done so, nor has she provided a sworn statement to counter the sworn declaration provided by Defendants.

A party seeking to compel arbitration must demonstrate that (1) a valid agreement to arbitrate exists, (2) the movant is entitled to invoke the arbitration clause, (3) the other party is bound by the clause, and (4) the claim asserted comes within the clause's scope.  Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011).  The opposing "party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate; the basis of the challenge [must] be directed specifically to the agreement to arbitrate before the court will intervene."  Biller v. S-H OpCo Greenwich Bay Manor, LLC, 961 F.3d 502, 513 (1st Cir. 2020) (internal quotation marks omitted).  That is, to avoid arbitration, the opposing party must ordinarily make a targeted independent challenge to the arbitration clause itself.  Id.  If the proponent of arbitration presents an authenticated agreement to arbitrate, an unconscionability attack on the agreement will fail unless it is supported by competent evidence, including evidence to demonstrate that any substantively unconscionable terms are not severable.  See Aquino v. BT's on the River, LLC, Civil Action No. 20-20090-Civ-Scola, 2020 WL 4194477, at *3-4 (S.D. Fla. July 21, 2020).

In this case, Awuah v. Coverall N. Am., Inc., 554 F.3d 7, 10 (1st Cir. 2009), is dispositive of the motion to compel Macklin and the fifteen Opt-ins who signed the License Agreement with Paragraph 14's mandate of binding arbitration based on the AAA Commercial Rules.  Awuah holds that "where the parties have themselves clearly and unmistakably agreed that the arbitrator should decide whether an issue is arbitrable, . . . [that] issue is to be decided by the arbitrator" and a "challenge to the validity of the contract itself is subject to arbitration and that allocation of authority to the arbitrator will also be respected by the court."  Id. at 10.  Awuah determined that an arbitration agreement that incorporates the AAA Commercial Rules – which include Rule 7(a) providing that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction,

including any objections with respect to the existence, scope or validity of the arbitration agreement" – "clearly and unmistakably commit[s] to the arbitrator the question whether the arbitration clause itself was valid." Id. at 9, 11; see also ECF. No. 12-2 at 14. According to Awuah, the scope of the issues for the arbitrator includes any challenge to the arbitration agreement based on unconscionability. Id. at 12. Awuah holds that, only when the "existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum," is there a threshold issue for consideration by the court. Id. at 13 (citing Green Tree Fin. Corp. v. Randolph, 531 U.S. 79, 90 (2000)). In that situation, the party raising the challenge is entitled to a ruling by the court concerning whether the arbitration remedy in the specific factual circumstances "is truly illusory." Awuah, 554 F.3d at 13.

In this case, Defendants have sustained their burden by presenting each of the sixteen executed (by the dancer) License Agreements, authenticated by the unrebutted Vianello Declarations I and II. Each Agreement invokes the AAA Commercial Rules. The Commercial Rules include the same Rule 7(a) delegating the issue of unconscionability of the arbitration agreement to the arbitrator that is quoted in Awuah. ECF No. 12-2 at 14; Awuah, 554 F.3d at 9-10. As to the argument that arbitration is illusory because of the high access fee (an issue that Awuah reserves for the court), Plaintiff's attorney conceded at the hearing that the AAA Commercial Rules' reliance on the AAA Employment Fee Schedule establishes that there is nothing illusory about the arbitration remedy mandated by the License Agreement. This concession is confirmed by the post-hearing initiation of arbitration proceedings by thirteen of the sixteen signers of the License Agreement. ECF No. 36 at 2 n.1. Accordingly, the Court

grants the motion to compel arbitration as to all sixteen of the dancers (Macklin and fifteen of the Opt-ins[12]) who signed the License Agreement.

That leaves the two dancers (DeAnna Gallo and Natasha Sajous) who signed the Wild Zebra's more recent Entertainment Agreement.  As authenticated by the unrebutted Vianello Declaration II, that Agreement clearly and unambiguously, Awuah, 554 F.3d at 10, delegates to the arbitrator the "**EXCLUSIVE AUTHORITY TO RESOLVE ANY AND ALL DISPUTES OVER THE FORMATION, VALIDITY, INTERPRETATION, SCOPE, AND/OR ENFORCEABILITY OF ANY PART OF THIS AGREEMENT INCLUDING THE ARBITRATION PROVISION CONTAINED IN THIS PARAGRAPH**." E.g., Vianello Decl. II ¶¶ 17-18; ECF No. 27-3 at 78.  Additionally, there is no basis to argue that arbitration is an illusory remedy – the Entertainment Agreement provides that the parties may agree on what arbitration service to use (including AAA, which Plaintiff has acknowledged is not an illusory remedy), with the Court as the backstop to select the arbitrator if the parties cannot agree.  ECF No. 27-3 at 77.  It further provides for the allocation of the cost of arbitration to be presumptively equal but allows the arbitrator to reallocate costs if equal "allocation would be unenforceable under applicable law."  ECF No. 27-3 at 79.  Confirming that there is nothing illusory about arbitration under the Entertainment Agreement is the reality that one of the two dancers who signed it has already initiated arbitration.  ECF No. 36 at 2 n.1.  Therefore, the Court also grants the motion to compel arbitration as to the two dancers[13] who signed the Entertainment Agreement.

---

[12] See n.8 supra.

[13] See n.9 supra.

13

As to the status of this case as these arbitrations proceed, Defendants have asked for a stay, but alternatively asked that the case be dismissed, ECF Nos. 11 & 27, while Macklin and the Opt-ins who are now in arbitration have asked that their claims be stayed, ECF No. 36 at 2 n.1.  I find that dismissal is not appropriate under the circumstances of this case.  Both parties have asked for a targeted stay (staying only the claims sent to arbitration); it remains possible that one or more dancers may return to the Court from arbitration with issues for the Court to resolve; and it remains unclear what will happen with the claims of the three Opt-ins who did not sign arbitration agreements, but whose standing to participate in the case remains in issue.  See generally Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 156 n.21 (1st Cir. 1998) (generally proper to stay proceedings until arbitration complete, court may dismiss when all issues before court are arbitrable); Doe #1 v. Déjà Vu Consulting Inc., Case No. 3:17-cv-00040, 2017 WL 3837730, at *17 (M.D. Tenn. Sept. 1, 2017) (while generally proper to stay proceedings until arbitration is complete, dismissal is appropriate when all claimants are already known to be subject to arbitration agreements and neither party asked for stay); Mercadante v. XE Servs., LLC, 78 F. Supp. 3d 131, 147 (D.D.C. 2015) (when court has decided only that arbitrator must decide whether claims are arbitrable, dismissal not appropriate).

Based on the foregoing, for now, the Court orders that the claims of Macklin and the sixteen Opt-ins who are ordered to proceed to binding arbitration are stayed.  The scope of the stay may be reassessed as the case proceeds.  Visibility Corp. v. Schilling Robotics, LLC, Civil Action No. 10-12280-JGD, 2011 WL 5075816, at *6-7 (D. Mass. Oct. 25, 2011) (if the arbitrator determines that no valid arbitration agreement exists, matter will return to court, so request for dismissal premature; defendants invited to file new motion to dismiss if arbitrator finds that all claims are arbitrable).  Otherwise, the case is not stayed.

**B.**   **Conditional Certification, § 216(b) Notice, and Equitable Tolling**

Pursuant to Section 216(b), employees who are not paid as required by FLSA may sue on behalf of themselves and "other employees similarly situated."  29 U.S.C. § 216(b).  For a collective action under FLSA, the action must be brought by a lead plaintiff, described in the statute as "one or more employees for and in behalf of himself or themselves and other employees similarly situated."  Id.  Other potential plaintiffs are required affirmatively to opt-in – "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  Id.; see generally Roberts v. TJX Cos. Inc., Civil Action No. 13-cv-13142-ADB, 2017 WL 1217114, at *2 (D. Mass. Mar. 31, 2017) (potential plaintiffs must affirmatively opt in); Reeves v. Alliant Techsystems, Inc., 77 F. Supp. 2d 242, 246 (D.R.I. 1999) (same).  To facilitate FLSA's collective action mechanism, district courts may direct that notice be sent in "appropriate cases to putative plaintiffs informing them of the pendency of the action and of their opportunity to opt-in as represented plaintiffs."  Roberts, 2017 WL 1217114, at *2 (internal quotation marks omitted).  In considering how and when "to implement 29 U.S.C. 216(b) . . . by facilitating notice to potential plaintiffs," district courts are directed to exercise discretion. Hoffmann-LaRoche Inc. v. Sperling, 493 U.S. 165, 169 (1989).

Pursuant to the now-familiar two-tiered approach for notice, Walsh, 2019 WL 1206885, at *6, the court makes a preliminary determination based on a minimal showing by the lead plaintiff whether potential class members are "similarly situated" with respect to a potential FLSA violation; if they are, the court enters an order of conditional certification and directs the giving of notice to potential class members so that they may choose whether to opt-in.  See generally id.; see also Roberts, 2017 WL 1217114, at *3.  At this first phase, "[p]otential

15

defenses, let alone credibility challenges and a showing of actual willingness of identified class members, are inappropriate factors." Gonpo v. Sonam's Stonewalls & Art LLC, Civil Action No. 16-40138-MGM, 2018 WL 1725695, at *6 (D. Mass. Apr. 9, 2018).  Later, on defendant's motion for de-certification based on the contention that the plaintiffs who have opted in are not in fact similarly situated, the court "makes a final 'similarly situated' determination." Id. at *4 (internal quotation marks omitted).  The two-stage process allows the court "the benefit of knowing" who has opted in when determining whether the lead plaintiffs are actually similarly situated.  Roberts, 2017 WL 1217114, at *3.

In this case, Macklin and the Opt-ins, through the complaint itself and the declarations (ECF Nos. 24-4 to 24-7) averred to by four of the dancers, have readily established that, during the period potentially in issue (from October 18, 2016, through at least the end of 2019), their compensation and work protocols were substantially similar, which is the predicate to conditional certification and the issuance of § 216(b) notice.  See generally McKnight v. Honeywell Safety Prods. USA, Inc., C.A. No. 16-132 S, 2017 WL 3447894, at *7 (D.R.I. Aug. 11, 2017) (courts will conditionally certify as long as putative plaintiffs share similar job requirements and pay provisions); Prescott v. Prudential Ins. Co., 729 F. Supp. 2d 357, 364 (D. Me. 2010) (similarly situated employees have similar job duties and pay provisions and are victims of common unlawful policy).  The problem is that, authenticated by the unrebutted averments in the Vianello Declarations I and II, it is also established that Macklin and sixteen of the Opt-ins each signed agreements with clauses that require binding arbitration, bar them from any participation in a class or collective action and limit them to asserting individualized

claims.[14]  Therefore, Macklin and the sixteen Opt-ins are contractually prohibited from acting as

the proponent of the pending conditional certification motion.  Further, the Court has now stayed

all their claims and granted Defendants' motions to compel all of them into binding arbitration.

That leaves only the three Opt-ins who did not sign an arbitration agreement.  Supported

by the Vianello Declaration II, Defendants argue that these Opt-ins lack standing to function as

"plaintiffs" for purposes of serving in the role of the class representative and moving for

conditional certification because none of them performed at the Wild Zebra during the period

relevant to her claim.  In response to this argument, none of these three Opt-ins tried to rebut the

sworn assertions in the Vianello Declaration.  If the Court were to interpret their opt-in notices as

a pleading (which they are not), all three would come up short; that is, all three would be subject

to Fed. R. Civ. P. 12(b)(1) dismissal for the failure to plead an injury in fact.  See Amrhein v.

eClinical Works, LLC, 954 F.3d 328, 333-34 (1st Cir. 2020) (constitutional standing requires

injury in fact).  In a report and recommendation that will issue in this case today (ECF No. 39), I

am recommending that the motion to dismiss be denied as premature because they are opt-ins

and not the lead plaintiff whose complaint must survive Fed. R. Civ. P. 12(b) scrutiny.

The conundrum, then, is whether some combination of the Opt-ins who signed

unchallenged collective action waivers and have been ordered into arbitration and the three Opt-

ins who did not sign such an agreement, but who facially appear to lack standing, somehow

supplies the Court with a sufficient foundation to certify a collective.  The handful of cases that

have addressed analogous challenges appear to look for practical solutions based on whether the

record suggests that a viable FLSA collective may exist.  For example, in D'Antuono v. C & G

---

[14] Consistent with the Supreme Court's jurisprudence on the topic, neither Macklin nor the Opt-ins has challenged
the enforceability of the class/collective action waiver provision in the License Agreement and the Entertainment
Agreement.  E.g., AT&T Mobility v. Concepcion, 563 U.S. 333 (2011).

of Groton, No. 3:11cv33 (MRK), 2011 WL 5878045, *3-4 (D. Conn. Nov. 23, 2011), the

Connecticut district court issued § 216(b) notice based on the finding that two of three lead

plaintiffs had signed enforceable arbitration agreements and that some potential opt-ins may have

signed the same agreement, while others may have signed an agreement that the court had not

analyzed.  With at least one lead plaintiff who did not sign an arbitration agreement and lacking

definitive evidence regarding the status of agreements signed by other dancers, the court declined

to extend its determination regarding the arbitration agreement signed by two of the lead

plaintiffs "to the arbitration agreements of all other exotic dancers who have not had a chance to

contest, on their individual facts, the applicability of their agreements." Id. at *4.  The Arizona

district court in Longnecker v. Am. Exp. Co., No. 2:14-cv-0069-HRH, 2014 WL 4071662 (D.

Ariz. Aug. 18, 2014), reached the opposite conclusion, and declined to issue notice, in reliance

on an equally practical analysis.  Based on the defendants' unrebutted declaration establishing

the existence of a policy that all new hires were required to sign an arbitration agreement that the

court found to be valid and enforceable, the court declined to issue notice to similarly situated

employees who were hired during the period after the policy was adopted.  Id. at *7.  More

recently, a district court in California examined these precedents and ordered that § 216(b) notice

may proceed, despite an enforceable collective action waiver by the class representative and a

representation that opt-ins would be subject to the same clause.  Ortega v. Spearmint Rhino Cos.

WorldWide, Inc., Case No. EDCV 17-206 IGN (KKx), 2019 WL 2871156, at *6-8 (C.D. Ca.

May 15, 2019).  In so ruling, Ortega relied heavily on the failure of the defendants to file a

properly supported motion authenticating individualized agreements waiving collective action

and seeking to compel the opt-ins into arbitration.  Id. at *3 n.2 & *6-7.  Ortega holds that

"[w]hile Opt-in Plaintiffs may ultimately be compelled to abandon their collective action and

litigate their claims in individual arbitration, the enforceability of their collective action waiver is most suitable for determination in the second stage of the collective action certification process." Id. at *7; accord Agerkop v. Sisyphian LLC, Case No. 19-10414-CBM-JPR(x), ECF No. 42 at 5-7 (C.D. Cal. August 18, 2020) (ECF No. 36-1) (when lead plaintiff signed enforceable arbitration agreement and potential opt-ins also may have signed same agreement, § 216(b) notice may still be ordered because defendants did not file evidence of arbitration agreement signed by putative class action members); Harris v. 68-444 Perez, Inc., Case No. 5:19-cv-02184-JGP-SP, ECF No. 41 at 4 (C.D. Cal. Apr. 23, 2020) (mere possibility that opt-ins bound by enforceable arbitration agreement signed by lead plaintiff not enough to avoid § 216(b) notice).

These out-of-circuit decisions must be read against the background of core principles, starting with the reality that, while FLSA does not "prescribe a method for certifying a collective action," Prescott, 729 F. Supp. 2d at 363, it does require that a FLSA claim must be brought by an employee on behalf of herself and others similarly situated, that is, by the so-called lead plaintiff.  29 U.S.C. § 216(b).  The Opt-ins do not fill that statutory role: by filing their consents, they have tolled the statute of limitations on their claims and, with conditional certification of the collective action, will be joined as part of a § 216(b) collective, subject to decertification.  See Chavira v. OS Rest. Servs., LLC, Civil Action No. 18-cv-10029-ADB, 2019 WL 4769101, at *5 (D. Mass. Sept. 30, 2019) ("§ 216(b) is a rule of joinder") (internal quotation marks omitted). But the filing of an opt-in notice is not subject to the guardrails of Fed. R. Civ. P. 15, Prescott, 729 F. Supp. 2d at 370, and is not analogous to Fed. R. Civ. P. 20 "joinder" in that "opt-in plaintiffs are held to a lesser standard than FLSA named plaintiffs or other plaintiffs who join in civil actions." Halle v. W. Penn Allegheny Health Sys. Inc., 842 F.3d 215, 225 n.9 (3d Cir. 2016).  Put differently, the statutory prerequisite to issuing notice to potential opt-in plaintiffs is

to have a plaintiff with her own FLSA claim who has adequately shown that others are "similarly situated." See Walsh, 2019 WL 1206885, at *6.  When the lead plaintiff is barred by a collective action waiver, the case cannot proceed to the conditional certification stage.  See generally Brown-King v. ServiceMaster, Co., LLC, No. 2:14-cv-02379-JTF-tm, 2015 WL 65499, at *4-5 (W.D. Tenn. Jan. 5, 2015); see Freeman v. MedStar Health Inc., 187 F. Supp. 3d 19, 25 (D.D.C. 2016) (court declines to conditionally certify collective as to claims for which "there is no longer a named plaintiff with a viable claim").

        In this case, Defendants have sustained their burden of establishing that Macklin, the lead plaintiff, and every Opt-in whose standing has not been challenged signed an enforceable agreement mandating arbitration and barring participation in a collective action.  Further, through the Vianello Declarations I and II, Defendants have supplied as-yet unrebutted evidence that every Wild Zebra dancer in the relevant period signed both an arbitration agreement and a class/collective action waiver.  Thus, this case is very different from Ortega and Agerkop, where the defendants presented arguments but insufficient proof; instead, it is similar to Longnecker, in which an unrebutted declaration established the policy of compelling all workers in a specified period to sign an enforceable agreement requiring arbitration and banning participation in a collective action.  Under such circumstances, as in Longnecker, this Court should not authorize notice to dancers in the face of a well-developed and unrebutted record establishing that there are none who will be able to join.  See Longnecker, 2014 WL 4071662, at *7 ("[T]here is no reason to give notice to any employee hired on or after June 1, 2003.  Any FLSA claims those employees might have must be arbitrated.").

        Based on the foregoing, it is premature to order § 216(b) notice to what, at the moment, is a headless collective that appears to have no eligible members, as the unrebutted Vianello

Declarations I and II demonstrate.  Mindful of the three Opt-ins waiting in the wings, the Court will allow sixty days for a motion to amend to substitute one or more of them to be a new lead plaintiff, recognizing that such a motion must survive the standing challenge of Defendants' pending motion to dismiss for lack of subject matter jurisdiction.  Alternatively, the motion to amend may seek to name some other person as lead plaintiff and putative class representative. Once there is a lead plaintiff who is not contractually barred by a collective action waiver and who can demonstrate that there are other similarly situated claimants with standing who may not also be contractually barred, the Court will promptly entertain a renewed motion for § 216(b) certification.  See generally McKnight, 2017 WL 3447894, at *11.  For now, the motion to certify and issue § 216(b) notice is denied without prejudice.  If sixty days pass without a motion to amend to add a potentially viable lead plaintiff, the Court will entertain a motion to strike the class allegations.

Finally, and for the same reason, Plaintiff's motion for equitable tolling is also denied without prejudice.  "Courts apply equitable tolling in FLSA cases where extraordinary circumstances beyond plaintiffs' control resulted in the failure to file timely claims, such as where a defendant's conduct caused untoward delay." McKnight v. Honeywell Safety Prods. USA, Inc., C.A. No. 16-132MSM, 2020 WL 1904468, at *2 (D.R.I. Apr. 17, 2020).  Equitable tolling makes no sense if there is no collective adversely affected by delay.  Further, the usual predicate – delay caused by an employer trying to whittle away at the size of the collective – is entirely missing from this case in that Defendants have answered promptly for each claimant either by asking the Court to enforce an authenticated arbitration/collective action waiver agreement or by making a factually supported challenge to standing.  Nor is this a case where tolling is required to avoid prejudice because potential claimants are unaware of potential FLSA

claims: while Defendants have complained about the unauthorized "notice process," the reality is that any prejudice has been significantly mitigated by the use of social media by Plaintiff's counsel, coupled with the extensive media and internet reports regarding other exotic dancer FLSA cases affecting the clubs in Providence, Rhode Island. This publicity means that individuals with potential claims are likely aware and can (as up to twenty Wild Zebra dancers already have) contact Plaintiff's counsel and engage him to file suit, opt-in to a suit, or initiate arbitration for those who are barred from suing or joining a collective.

Subsequent developments in this case may establish that equitable tolling is appropriate; for now, however, it is denied.

## III.    CONCLUSION

Based on the foregoing, Defendants' Motions to Compel Arbitration, ECF Nos. 11 and 27 (in relevant part), are granted with respect to the claims of Macklin and sixteen of the Opt-ins (Shannon Gavel, Shakiyla Zito, Sierra (Skye) Acosta, Kimberly Davila, Jasmine Vasquez, Yalett Alejandro, Lashaunda Ingram, Kaitlin Throckmorton, Brittney Guilmette, Elisabeth James, Alicia Barnella, Nicole Ely, Deja Jones, Daizha Pittman, Natasha Sajous and DeAnna Gallo). Each of these claims are ordered to arbitration and this case, as to each of them, is stayed while each arbitration proceeds. Plaintiffs' Motions for Conditional Certification, ECF No. 24, and Equitable Tolling, ECF No. 34, are denied without prejudice. The balance of the relief sought by ECF No. 27 is addressed in a report and recommendation that issued today. ECF No. 39.

Beginning on December 31, 2020, and thereafter quarterly, Defendants are directed to file a short joint status report regarding the arbitration proceedings.

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
November 2, 2020